**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| JENNIFER LANE, DVM, and | § | |
| REBECCA BLACKWOOD, DVM | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | |
| | § | **CASE NO. 6:12-CV-00310-WSS** |
| **SCOTT & WHITE HEALTHCARE;** | § | |
| **SCOTT & WHITE MEMORIAL** | § | |
| **HOSPITAL AND SCOTT, SHERWOOD** | § | |
| **AND BRINDELY FOUNDATION; and** | § | |
| **RICHARD BESWICK, PHD, MBA,** | § | |
| *Defendants.* | § | |

**PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**


**(HEARING REQUESTED)**

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY ................................................................................ 1

FACTS ............................................................................................................................... 5

I.     Laboratory Animal Welfare Law ......................................................................... 6
  A.   Animal Care and Use Programs...............................................7_Toc359872594
  B.   Attending Veterinarian...................................................................................... 7
  C.   The Institutional Animal Care and Use Committee — the IACUC ................. 7
  D.   Animal Welfare Assurance .............................................................................. 8

II.    Plaintiffs' Employment and the Integrated Animal Care and Use Programs at the Temple
       Campus ............................................................................................................. 10

III.   Defendant Richard Beswick, PhD, MBA .......................................................... 13

IV.    Defendant Beswick's Termination of Plaintiffs ................................................ 15

ARUGMENTS AND AUTHORITIES.............................................................................. 20

I.     Summary Judgment Burdens and Standards...................................................... 20

II.    The Scott & White Defendants May Be Found Liable under Section 1983...................... 21

III.   Defendants' Conduct is Fairly Attributable to the State ................................... 21
  A.   State Action is Satisfied Under the Entwinement Test.................................... 23
  B.   The Actions Complained of Are Fairly Attributable to the State. .................. 23

IV.    Defendant Beswick is Not Entitled to Qualified Immunity.............................. 25

V.     The Animal Welfare Non-Retaliation Policy Modified Plaintiffs' At-Will Employment . 27
  A.   The "Scott & White Healthcare Nature of Employment/Termination" Policy Was Not a
       Term of Plaintiffs' Employment ................................................................... 29

B.   Guiding Business Principles Corporate Compliance Code of Conduct is Irrelevant ........................................................................................ 31_Toc359872714

C.   The Animal Welfare Non-Retaliation Policy Binds Scott & White ................................ 31

VI.   Dr. Lane Did Not Resign, But Was Forced Out ................................................. 33

VII.   Scott & White Healthcare and Scott & White Hospital Should Not be Dismissed .......... 34

VIII.   Defendants Are Not Entitled to Summary Judgment on Plaintiff Blackwood *Quantum Meriut* Claim Because They Did Not Unequivocally Deny that She Would Receive Compensation ................................................................................ 34

**EXHIBITS**

Plaintiffs Rebecca Blackwood, DVM and Jennifer F. Lane, DVM rely on the following exhibits, which are located in Plaintiffs' Combined Appendix filed contemporaneously herewith pursuant to Local Rule CV-7.

| EXHIBIT | DESCRIPTION |
|---|---|
| 1 | Temple Principal Investigators Council Documents [PLAINTIFFS 387] |
| 2 | Temple Principal Investigators Council Documents [SW_LAN_ 1245-1256] |
| 3 | Resource Binder for Members of the Institutional Animal Care and Use Committee IACUC [PLAINTIFFS 02033-02178] |
| 4 | Excerpts of Scott & White Division of Research and Education Department of Comparative Medicine [PLAINTIFFS 1127-1145, PLAINTIFFS 1617-1666] |
| 5 | Scott & White Animal Welfare Assurance [SW_LAN_ 354-372] |
| 6 | Email from R. Beswick to R. Blackwood (July 21, 2011) [Beswick Dep. Ex. 13; PLAINTIFFS 00002] |
| 7 | Letter from R. Beswick to R. Blackwood (Aug. 5, 2011) [Beswick Dep. Ex. 14; PLAINTIFFS 00007] |
| 8 | TAMHSC/Scott & White Blackwood Appointment Letter from D. Dostal [PLAINTIFFS 00371] |
| 9 | Scott & White Clinic Senior Staff Handbook [PLAINTIFFS 01027-01098] |
| 10 | Scott & White Non-Retaliation Policy [PLAINTIFFS 00653] |
| 11 | Scott & White Hospital SOS Filing |
| 12 | Declaration of Dr. Glen Otto and Expert Report of Dr. Glen Otto |
| 13 | Scott & White Attending Veterinarian Lane Appointment Letter [SW_LAN_ 7] |
| 14 | Declaration of Rebecca Blackwood, DVM |
| 15 | Declaration of Jennifer F. Lane, DVM |
| 16 | Affiliation Agreement between The Texas A&M University System and Scott & White Clinic; Scott and White Memorial Hospital and Scott, Sherwood and Brindley Foundation and The Central Texas Veterans Health Care System [PLAINTIFFS 00666-00678] |
| 17 | Dr. Beswick Deposition Transcripts (Beswick Dep. Exhibit 8) |
| 18 | Dr. Wesson Deposition Transcript |
| 19 | Declaration of Isabelle M. Antongiorgi |
| 20 | TAMHSC/Scott & White Neuroscience Research Website |
| 21 | TAMHSC/Scott & White Institute for Regenerative Medicine Website |
| 22 | Excepts of Guide for the Care and Use of Laboratory Animals [PLAINTIFFS 00105, PLAINTIFFS 00117-00170, PLAINTIFFS 00235-00236, PLAINTIFFS 00329-00330] |
| 23 | TAMHSC Beswick Appointment Letter [SW_LAN_ 1451] |
| 24 | DCM Director/Attending Veterinarian Job Description [SW_LAN_ 64-67] |
| 25 | Declaration of Texas A&M Health Science Center (Dr. Vernon Tesh) |
| 26 | Declaration of Texas A&M Health Science Center (Dr. David Carlson) |

| | |
|---|---|
| **27** | Declaration of Texas A&M Health Science Center (Dr. Barry Nelson) |
| **28** | Wesson Position Specification [HSC-000929-000942] **(Confidential – filed under seal)** |
| **29** | Texas A&M Assurance [HSC-000945-000968] **(Confidential – filed under seal)** |
| **30** | Transcript of July 5, 2011 Audio Recording (PLAINTIFFS 01954) |
| **31** | Transcript of Audio Recording on or about July 15, 2011 (PLAINTIFFS 01953) |
| **32** | TAMHSC Temple Campus Website |
| **33** | Scott & White Department of Comparative Medicine Website |
| **34** | Texas A&M/Scott & White Sample Contract [HSC 000041-000048; HSC 000049-000055] **(Confidential – filed under seal)** |
| **35** | S&W Wesson Directory Listing |
| **36** | Excerpts of AALAC Program Description [SW_LAN_ 79-86] |
| **37** | Wesson Salary Agreement [HSC 000002-000006 **(Confidential – filed under seal)** |

## INTRODUCTION AND SUMMARY

1.      Plaintiffs Jennifer Lane, DVM, and Rebecca Blackwood, DVM, hereby respond to both the Scott & White Defendants' Motion for Summary Judgment (Dkt. 48) and Defendant Dr. Richard Beswick's Motion for Summary Judgment (Dkt. 46).   Plaintiffs bring breach-of-contact and Section 1983 claims against Defendants Scott & White Healthcare; Scott & White Clinic; and Scott & White Memorial Hospital and Scott, Sherwood and Brindely Foundation d/b/a Scott & White Healthcare[1] (collectively "Scott & White") and Plaintiffs' supervisor, Defendant Richard Beswick, PhD, MBA, Scott & White Senior Vice President of Research and Assistant Dean for Research for the Division of Research & Education at the Texas A&M Health Science Center on the Temple Campus ("TAMHSC").[2]

2.      Plaintiffs' employment contracts were breached when they were retaliated against for reporting animal welfare violations, a reprisal that also violated federal law.   Scott & White engaged Drs. Lane and Blackwood as veterinarians for the integrated laboratory animal program of Scott & White; TAMHSC; and the Central Texas Veterans Health Care System ("VA") to satisfy requirements of federal animal welfare law and provide veterinary care and assistance.[3]

3.      An express written policy of Plaintiffs' employment was the strict prohibition against retaliation and reprisals for reporting deviations from animal welfare law.[4] This was reflected in a posting that Plaintiffs saw everyday they went to work, for the entire tenure of their employment.[5]   Scott & White now disavows that policy.

---

[1]  *See* Ex. 11 Scott & White Hospital SOS Filing.
[2]   Ex. 23 TAMHSC Beswick Appointment Letter.   Ex. 17 Beswick Dep. 31:4, 10, 13-15; 37:6-8, 38:5-14; Ex. 14 Blackwood Dec. ¶ 11; Ex. 15 Lane Dec. ¶ 11.
[3]  *See* Ex. 15 Lane Dec. ¶¶ 4, 9; Ex. 14 Blackwood Dec. ¶¶ 4, 9.
[4]  Ex. 10 Animal Welfare Non-Retaliation Policy; Ex. 3 IACUC Resource Binder at Plaintiffs 02047.
[5]  Ex. 10 Animal Welfare Non-Retaliation Policy; Ex. 14 Blackwood Dec. ¶¶ 21-22; Ex. 15 Lane Dec. ¶¶ 19-21; Ex. 17 Beswick Dep. 92:4-6;

4.      It is undeniable that Plaintiffs' terminations were tied to their reporting of animal welfare issues.  On or about May 17, 2011, Plaintiffs reported a significant deviation of animal welfare law at the meeting of the TAMHSC and Scott & White Institutional Animal Care and Use Committees ("IACUCs").[6]  Dr. David Dostal, chair of both the TAMHSC and Scott & White IACUCs, complained to Dr. Beswick about the Plaintiffs' report at the May 17, 2011 meeting.[7]

5.      On July 5, 2011, citing the May 2011 IACUC meeting, Dr. Beswick terminated Dr. Blackwood and told Dr. Lane that she was being demoted but ultimately, she was forced to leave on July 15, 2011.[8]  Dr. Beswick admits that the report at the May 17, 2011 IACUC meeting was at least one reason why he made the decisions he did:

| Counsel: | And you were referring to the incident at the IACUC meeting that Dr. Dostal told you about? |
|---|---|
| Dr. Beswick: | Yes |
| Counsel: | So that was one of the reasons you wanted to demote and terminate, is that correct? |
| Dr. Beswick: | That was one of the many, many reasons.[9] |

6.      At a recorded July 15, 2011 meeting, just 10 days after the terminations, Dr. Beswick expressly told Dr. Blackwood that her termination was due to her aggressive reporting of violations at IACUC meetings.[10]

---

[6]  Ex. 14 Blackwood Dec. ¶ 12; Ex. 15 Lane Dec. ¶ 12.
[7]  Ex. 17 Beswick Dep.  224:4-15; 283:25-25; *see also* Ex. 15 Lane Dec. ¶ 13; Ex. 8 TAMHSC/Scott & White Blackwood Appointment Letter from D. Dostal.
[8]  Ex. 15 Lane Dec. ¶¶ 12, 13; Ex. 17 Beswick Dep. 108:17-109:9.  Dr. Blackwood took on Dr. Lane's duties thereafter and demanded additional  consideration but was never paid.  She brings a *quantum meriut* claim.
[9]  Ex. 17 Beswick Dep. 87:10-88:4;  *see also*  Ex. 17 Beswick Dep.  224:4-15 (stating that Dr. Dostal reported a verbal interaction between Dr. Blackwood and an investigator in connection with enforcing compliance with animal welfare regulations).
[10]  Ex. 31 July 15, 2011 Meeting Transcript 10:16-17, 19; 11:5-11 (Plaintiffs 01953); *see also* Ex. 18 Wesson Dep. 58:9-18 (testifying that plaintiffs went overboard with their animal care responsibilities).

7.      In their Motions, Defendants do not challenge the causal connection between Plaintiffs' terminations and their reports of animal welfare violations.   Rather, Defendants move for summary judgment on the following grounds:

    a.  *Section 1983 & Private Corporations:* Scott & White alleges it cannot be liable under Section 1983 because the claim is based allegedly only on Dr. Beswick's conduct.

    b.  *State Action*:

        i.  Defendants allege that Dr. Beswick, Assistant Dean of Research for TAMHSC, is not a state actor, that his conduct is not attributable to the State, and further that he is entitled to qualified immunity; and

        ii.  Defendants allege that Scott & White's conduct is not fairly attributable to the State under the *joint-action* or *nexus test*.

    c.  *The Contract*: Curiously, Defendants allege the Animal Welfare Non-Retaliation Policy, which was posted in all the animal facilities, was not a proper Scott & White policy.

    d.  *Breach of Dr. Lane's Contract*.   Defendants allege that Dr. Lane resigned.

    e.  *Quantum Meriut*:  Defendants argue that despite Plaintiff Blackwood's demands for consideration for the additional services she performed, she "agreed" to perform them for free as a matter of law.

    f.  *Scott & White Healthcare and Scott & White Memorial Hospital's Involvement*: While contemporaneously moving to deny Plaintiffs' discovery on their role, Scott & White Memorial Hospital and Scott & White Healthcare move for summary judgment on the grounds that they had no role in Plaintiffs' employment and the deprivation of their constitutional rights.

8.      Defendants' Motions must be denied for the following reasons:

    a.  *The Contract*:

        i.  Plaintiffs were never provided with the at-will employment disclaimer on which Defendants rely and no such disclaimer appears on the posted Animal Welfare Non-Retaliation Policy, in the IACUC Resource Binder, or in the Senior Staff Handbook that were actually provided to Plaintiffs;[11]

---

[11] Ex. 10 Animal Welfare Non-Retaliation Policy; Ex. 9 Senior Staff Handbook; Ex. 3 IACUC Resource Binder. Defendants have not presented any evidence that Plaintiffs were provided with notice of any at-will disclaimer.

      ii.   Under *Vida*, the non-retaliation policy creates an express and clear limitation on Scott & White's ability to terminate Plaintiffs;[12] and

      iii.  Federal law identified the IACUC as an agent of the institution and the non-retaliation posting was made with implied and/or apparent authority and its actions were ratified by Scott & White.

  b.  <u>*Breach of Dr. Lane's Contract*</u>.  Dr. Lane never resigned, she was demoted and then forced to leave.  At the very least, genuine issues of material fact remain as to Dr. Lane's discharge.

  c.  <u>*Section 1983 & Private Corporations*</u>:  Scott & White may be liable under Section 1983 in virtue of its sanction and the "official imprimatur" regarding Plaintiffs' termination.[13]

  d.  <u>*State Action*</u>:  A genuine issue of material fact exists regarding whether Scott & White and Defendant Beswick were state actors and/or acting under the color of state law and whether Defendants' conduct is fairly attributable to the State and constitutes state action under the *joint-action* test, the *nexus test*; and the *entwinement* test (a test not addressed in Defendants' Motions).

  e.  <u>*Qualified Immunity*</u>.  As an employee of a private entity, Defendant Beswick is not entitled to qualified immunity even though his conduct constitutes state action.[14]

  f.  <u>*Scott & White Healthcare and Scott & White Hospital's involvement*</u>:  Although Scott & White Clinic paid Plaintiffs, there is evidence that Scott & White Hospital (which does business as Scott & White Healthcare) was the employer and/or participated in the termination decisions and summary judgment is inappropriate given these Defendants refusal to participate in discovery.

9.    This Court's jurisdiction is based on Plaintiffs' Section 1983 claim, with only pendant jurisdiction over Plaintiffs' state-law claims for breach of contract and *quantum meriut*.  The Court should therefore consider the challenges to Plaintiffs' Section 1983 claims first.  If summary judgment is granted on the Section 1983 claim, the proper course would be to dismiss Plaintiffs' state-law claims for want of jurisdiction without prejudice to re-filing in state court.

---

[12] *Vida v. El Paso Employees' Fed. Credit Union*, 885 S.W.2d 177 (Tex. App.—El Paso 1994, no writ).

[13] *Auster Oil & Gas, Inc. v. Stream*, 835 F.2d 597, 602 (5th Cir. 1988); *Brown v. Wilson Cnty*, SA-97-CA-1473-OG, 1999 WL 33290666 (W.D. Tex. Mar. 31, 1999); *Muktar v. Webster*, CIV.A.3:03-CV-1405-P, 2004 WL 2008500 (N.D. Tex. Sept. 8, 2004). Ex. 17 Dep. Beswick 74:7-24, 75:13-16, 76:7-8, 87:10-88:4, 211:3-11; Ex. 18 Wesson Dep. 74:16-76:9, *see also* Ex. 18 Wesson Dep. 43:8-19; 56:10-23.

[14] *Richardson v. McKnight*, 521 U.S. 399, 412 (1997); *see also U.S. ex rel. Barron v. Deloitte & Touche, L.L.P.*, 381 F.3d 438, 443 (5th Cir. 2004).

## FACTS

10.     For over 30 years, Scott & White, TAMHSC, and the VA have operated an accredited medical school: the Texas A&M University College of Medicine.[15]   They use the Temple campus as the core clinical campus and primary teaching facility of the College of Medicine.[16] TAMHSC, Scott & White, and the VA collaborate in a joint effort "to attain excellence in . . . the advancement of medical knowledge through investigation and publication of the results."[17]

11.     In 2000, TAMHSC, the VA, and Scott & White expressly committed themselves to the goal of a completely integrated research program.[18]   They have "expressly agree[d] to use their respective mechanisms of assurance for the benefit of the mutual programs and where possible to eliminate duplication."[19]   Additionally, they have agreed to utilize "common peer review mechanisms for scientific review of research protocols" and otherwise share resources.[20]

12.     In 2008, Drs. Lane and Blackwood were engaged by Scott & White to satisfy the federal requirements of veterinary care, oversight, and compliance for the integrated animal laboratory program of TAMHSC, Scott & White, and the VA on the Temple campus.

---

[15] *See* Ex. 16 Affiliation Agreement Between the Texas A&M University System and Scott & White Clinic, Scott and White Memorial Hospital and Scott, Sherwood and Brindely Foundation and the Texas Central Veterans Health Care System (Aug. 24, 2000) (hereinafter "Affiliation Agreement").

Although Defendants attempt to discount the probative value of the Affiliation Agreement, it was properly executed by person with authority and there is no evidence that it was ever rescinded.  Ex. 18 Wesson Dep. 143:9-144:8 ("I'm not aware that it's been rejected.").   As demonstrated both the very public and continuing partnership between TAMHSC and Scott & White and by continuous recitals of the parties, the Affiliation Agreement is alive and well.  *See e.g.* Ex. 34 Sample Texas A&M/Scott & White Contracts (citing Affiliation Agreement); Ex. 36 Wesson TANHSC/ S&W Salary Contract (same); Ex. 32 TAMHSC Temple Campus website; Ex. 21 TAMHSC/Scott & White Institute for Regenerative Medicine Website; Ex. 20 TAMHSC/Scott & White Neuroscience Research Website; *see also* Ex. 15 Lane Dec. ¶ 9 (stating she provided services in connection with the TAMHSC/Scott & White Neuroscience Institute and the Institute for Regenerative Medicine).

[16] Ex. 16 Affiliation Agreement, p. 1.

[17] Ex. 16 Affiliation Agreement, p. 2.

[18] Ex. 16 Affiliation Agreement, pp. 10-11.

[19] Ex. 16 Affiliation Agreement p. 10.

[20] Ex. 16 Affiliation Agreement p. 10.

### I.    Laboratory Animal Welfare Law

13.    To understand the collaboration and partnership amongst the Scott & White and TAMHSC, as well as the Plaintiffs and Defendant Beswick's role, some explanation of the federal laws and policies is required. "The use of laboratory animals is governed by an interrelated, dynamic system of regulations, policies, guidelines, and procedures."[21] Numerous sources of law and policy impose various and many requirements on research institutions. These include the Animal Welfare Act ("AWA");[22] USDA regulations;[23] the Public Health Service ("PHS") Act and Health Research Extension Act;[24] the National Institute of Health's Public Health Service Policy on Humane Care and Use of Laboratory Animals ("PHS Policy"), administered through its Office of Laboratory Animal Welfare ("OLAW");[25] and the Guide for the Care and Use of Laboratory Animals ("Guide").[26]

14.    Failure to satisfy federal requirements risks the suspension of research, penalties, fines, disqualification for grants, and potentially the rescission of grants.

---

[21]  Ex. 22 Excerpts of the GUIDE p. 12.   For a general discussion of the regulatory framework, please see Ex. 12 Declaration of Glen M. Otto and his expert report appended thereto.  The United States Department of Agriculture ("USDA") and United Stated Department of Health and Human Services ("HHS") are two of several federal agencies that cooperate to regulate the care and treatment of animals at biomedical research facilities.  Congress has directed state agencies to cooperate in the promulgation and enforcement of animal regulations.  *See* 7 U.S.C. § 2143.  These agencies are responsible for establishing guidelines for "[t]he proper care of animals to be used in biomedical and behavioral research" and "[t]he proper treatment of animals which are to be used in such research." 42 U.S.C. § 289d (a).  In addition to the foregoing, the Association for the Assessment and Accreditation of Laboratory Animal Care International ("AAALAC") is a private organization that serves as an accrediting body.  It evaluations research institutions for compliance with current laws, regulations, and standards including the Guide, the PHS Policy, the AWA, and USDA regulations. *See* Ex. __ Excerpts of AAALAC Program Description.

[22] 7 U.S.C. §§ 2131, *et. seq.*  The USDA is primarily responsible for the administration of the AWA.

[23] 9 C.F.R. §§ 1.1, *et. seq.*

[24] 42 U.S.C. § 289d ; Health Research Extension Act of 1985, Pub. L. No. 99-158, 99 Stat. 820, § 495.

[25] The HHS, acting through the National Institutes of Health ("NIH"), is responsible for implementing the Public Health Service ("PHS") Act as amended by the Health Research Extension Act of 1985. 42 U.S.C. § 289d ; Health Research Extension Act of 1985, Pub. L. No. 99-158, 99 Stat. 820, § 495.   The NIH fulfills its obligations through its Office of Laboratory Animal Welfare ("OLAW"), which administers the Public Health Service ("PHS") Policy on Humane Care and Use of Laboratory Animals and Guide for the Care and Use of Laboratory Animals. PUBLIC HEALTH SERVICE POLICY ON HUMANE CARE AND USE OF LABORATORY ANIMALS (2002), http://grants.theNIH.gov/grants/olaw/references/PHSpolicylabanimals.pdf; [hereinafter "PHS Policy"]; GUIDE FOR THE CARE OF LABORATORY ANIMALS (National Academies Press 8th ed. 2010), http://www.nap.edu/openbook.php?record_id=5140&page=R1 [hereinafter "GUIDE"].

[26] Ex. 22 Excerpts of the GUIDE

### A.      Animal Care and Use Programs

15.      Federal law requires animal research institutions to develop and implement a federally-approved animal care and use program designed to ensure that the institution conducts its research in compliance with all applicable animal welfare law.[27]  "An effective Program requires clearly defined roles that align responsibility with regulatory and management authority."[28]

### B.      Attending Veterinarian

16.      Federal law requires institutions conducting animal research to employ an attending veterinarian ("Attending Veterinarian"), an appropriately experienced and educated person assigned the "appropriate authority to ensure the provision of adequate veterinary care and to oversee the adequacy of other aspects of animal care and use."[29]   Any "[p]rocedure that may cause more than momentary or slight pain or distress to the animals . . . [must] involve, in their planning, consultation with the attending veterinarian or his or her designee."[30]  "The Attending Veterinarian is responsible for the health and well-being of *all* laboratory animals used at the institution."[31]

### C.      The Institutional Animal Care and Use Committee — the IACUC

17.      Additionally, the executive officer of a research facility must appoint an Institutional Animal Care and Use Committee ("IACUC"), which has general oversight responsibility for the program, including the evaluation of the treatment of animals at the facility, certifying compliance, and reporting violations to the appropriate authorities under federal law.[32]  At least

---

[27] PHS POLICY at pp. 9-10; Ex. 22 Excerpts of the GUIDE AT P. 6.
[28] Ex. 22 Excerpts of the GUIDE at p. 13.
[29] 9 C.F.R. §§ 1.1, 2.33(a)(2).
[30] 9 C.F.R. § 2.31(d)(vi)(B).
[31] Ex. 22 Excerpts of the GUIDE p. 14.
[32]  42 U.S.C. § 289d; 7 USC § 2143 (b); 9 C.F.R. §§ 1.1, 2.31; PHS POLICY at pp 11-13.

one committee member must be a veterinarian who has program authority and responsibility.[33] This is usually the Attending Veterinarian. The IACUC and the Institutional Official are required to report incidents and violations to federal authorities.[34]

### D.  Animal Welfare Assurance

18.     The research institution must supply federal agencies with an Animal Welfare Assurance ("Assurance"), signed by an individual with the requisite authority to commit the institution to compliance under the law.[35]  The law designates this authorized individual as the "Institutional Official."[36]  The Assurance must commit the institution to compliance and provide details of the institution's program, including an identification of IACUC members and those who will participate in the implementation of the program, i.e. the line of authority.[37]

19.     The Scott & White Memorial Hospital Animal Welfare Assurance was submitted to the federal government on or about April 9, 2010.[38]  By submitting this Assurance, Scott & White assured the United States government that Scott & White would comply with federal animal welfare law:

> I, Richard Beswick, Ph.D. as named Institutional Official . . . provide assurance that this Institution will comply with the . . . PHS Policy. . . .[39]
>
> Institutional Compliance
>
> A.     The Institution will comply with all applicable provisions of the Animal Welfare Act and other Federal statutes and regulations relating to animals.

---

[33]  9 C.F.R. § 2.31(b)(i); PHS POLICY at p. 11.
[34] 7 U.S.C. § 2143; PHS POLICY at p. 18; OLAW, Notice Number NOT-OD-05-034: Guidance on Prompt Reporting to OLAW under PHS Policy on Humane Care and Use of Laboratory Animals, http://grants.nih.gov/grants/guide/notice-files/NOT-OD-05-034.html
[35]  9 C.F.R. §§ 1.1; PHS POLICY at pp. 8-9.
[36]  9 C.F.R. §§ 1.1; PHS POLICY at pp. 8-9.
[37]  PHS POLICY at pp. 8-9.
[38]  Ex. 5 Scott & White Assurance.
[39]  Ex. 5, Scott & White Assurance, *preamble*.

     B.    This Institution is guided by the [Guide].

     C.    This Institution acknowledges and accepts responsibility for the care and use of animals involved in activities covered by this Assurance.  As partial fulfillment of this responsibility, this Institution will ensure that all individuals involved in the care and use of laboratory animals understand their individual and collective responsibilities for compliance with this Assurance, as well as all other applicable laws and regulations pertaining to animal care and use.

     D.    This Institution has established and will maintain a program for activities involving animals in accordance with the [Guide].[40]

     **E.**    **Non-Retaliation Requirements**

20.    Part of the federal law to which Scott & White committed itself in the Assurance is the prohibition against retaliation for reporting violations:

> No facility employee, Committee member or laboratory personnel shall be discriminated against or subject to any reprisal for reporting violations of any regulation or standard under the Act.[41]

21.    Scott & White's adoption of a strict policy prohibiting such retaliation is reflected in the Animal Welfare Non-Retaliation was part of the Scott & White polices and formed a part of Plaintiffs' contract.[42]  Further, the IACUC Resource Binder that was provided to Plaintiffs expressly provides that "An individual reporting a concern will be provided protection against reprisals as required under the Animal Welfare Act."[43]

22.    Thus, the federal laws, regulations, and policies became part and parcel of Scott & White's policies, assuring their employees that their employment would be protected from

---

[40]  Ex. 5, Scott & White Assurance, § II; *see also* TAMHSC Assurance at § II.
[41]  9 C.F.R. § 2.32(c)(4); PHS Policy at p. 9 n. 2 ("Compliance with the USDA regulations is an absolute requirement of this Policy.").
[42]  Ex. 10 Animal Welfare Non-Retaliation Policy.  Dr. Beswick testified, on behalf of himself and Defendant Scott & White Clinic, that he did not believe that Scott & White could retaliate against persons for reporting violations of animal welfare policy and that he would not have signed the Scott & White Assurance had he thought that it was permissible for Scott & White to do so. Ex. 17 Beswick Dep. 203:13-204:8.
[43]  Ex. 3 IACUC Resource Binder at Plaintiffs 02047.

retaliation, not by virtue of a statutory cause of action, but by Scott & White's voluntary incorporation of these policies.

## II. Plaintiffs' Employment and the Integrated Animal Care and Use Programs at the Temple Campus

23.     TAMHSC, Scott & White, and the VA have a thoroughly integrated animal care and use program, which formed the context of Plaintiffs' employment and termination.[44]   TAMHSC and Scott & White research all takes place in the same buildings.[45]   Drs. Lane and Blackwood provided services to both TAMHSC and Scott & White and there was substantially no differentiation in the services so provided.[46]

24.     From 2008 through July 15, 2011, Dr. Lane was the Director of the Scott & White Department of Comparative Medicine ("Department of Comparative Medicine" or "DCM"), served as Attending Veterinarian to both Scott & White and TAMHSC, served on the IACUCs.[47]

25.     From 2008 to July 15, 2011, Dr. Blackwood served as Associate Director of the Department of Comparative Medicine; Senior Veterinarian for Scott & White and TAMHSC; and served on both of the IACUCs.[48]   From July 15, 2011 through January of 2012, Dr. Blackwood took over Dr. Lane's duties on an interim basis.

26.     Scott & White describes the Department of Comparative Medicine as follows:

> The Department of Comparative Medicine (DCM) is the centrally administered support service for animal research and teaching programs at Scott & White, the Texas A&M Health Science Center College of Medicine (TAMHSC-COM) Temple Campus and the Central Texas Veterans Health Care System (CVTHSC)  Our

---

[44] Ex. 15 Lane Dec. ¶¶ 4, 6-9, 11; Ex. 14 Blackwood Dec. ¶¶ 4, 6-9, 11; Ex. 4 DCM Handbook; Ex. 33 Scott & White Department of Comparative Medicine Website; Ex. 3 IACUC Resource Binder at Plaintiffs 02041-42.

[45] Ex. 17 Beswick Dep. 311:3-22.

[46] Ex. 18 Wesson Dep. 44:11-15, 45:1-5; 46:14-18; 47:4.  Ex. 15 Lane Dec., ¶ 4, 6-9, 11 ; Ex. 14 Blackwood Dec. ¶¶ 4, 6-9, 11.

[47] Ex. 15 Lane Dec. ¶¶ 4, 9; Ex. 13 Scott & White Attending Veterinarian Lane Appointment Letter.

[48] For the first few months of Dr. Blackwood's tenure at the Temple campus, she provided veterinary and compliance services solely to one researcher at the Cancer Research Institute.  However, in the summer of 2008, her duties were extended to the other laboratories and entities at the Temple research facilities.  *See* Ex. 14 Blackwood Dec. ¶¶ 4, 9.

facilities and serves are available for all affiliated physicians, faculty, trainees, staff, and students who have been approved to conduce animal research by the Institutional Animal Care and Use Committee (IACUC).  Scott & white [sic] and TAMHSC-COM Temple Campus programs are accredited by the Association for the Assessment and Accreditation of Laboratory Animal Care International (AAALAC).  *All research is conducted in accordance with federal regulation and guidelines and assurances for our programs are held with the Office of Laboratory Animal Welfare (OLAW).*[49]

27.     By stating that all research is conducted in accordance with federal law, Scott & White

limits its employment at-will policies in accordance with the non-retaliation provisions of federal

animal welfare law.  The same collaborative relationship between TAMHSC and Scott & White

specifically regarding the animal use program is reflected in the DCM handbooks:

The DCM is the centrally administered support service for animal research and teaching programs at Scott & White, the Texas A&M Health Science Center – College of Medicine (TAMHSC-COM) Temple Campus and the Central Texas Veteran's Health Care System (CTVHCS). Our facilities and services are available for all affiliated physicians, faculty, trainees, staff, and students who have been approved to conduct animal research by the Institutional Animal Care and Use Committee (IACUC). Scott & White and TAMHSC-COM Temple Campus programs are accredited by the Association for the Assessment and Accreditation of Laboratory Animal Care, International (AAALAC, International.).[50]

28.     As relayed in the "Scott & White Healthcare" job description produced by Defendants,

the Director/Attending Veterinarians' duties expressly encompassed services to TAMHSC:

The Director/Attending Veterinarian of the Department of Comparative Medicine (DCM) has oversight and leadership responsibility for the DCM unit. . . .

The DCM unit provide the components necessary to ensure successful completion of research studies for Scott & White Healthcare, Texas A&M Health Science Center College of Medicine (TAMHSC-COM) and the Central Texas Veterans Health Care System (CTVHSC).  These components include all

---

[49] Ex. 33 Scott & White Department of Comparative Medicine Website.
[50]  Ex. 4 DCM Handbooks at Plaintiffs 01128,1618.

aspects of animal resources, animal acquisition and production, animal husbandry, veterinary medicine and surgery, noninvasive imaging, animal behavioral well-being and environmental enrichment, pathology, health and genetics monitoring, and occupational health and safety.  This position is integral to assuring that SW, TAMHSC-COM and CTVHSC remains compliance with all applicable regulations, guidelines, and policies.  Position is expected to participate as a member of the Institutional IACUC and IBC. . . .[51]

29.     As reflected in the federal laws, regulations, and polices, as well as TAMHSC and Scott & White's respective assurances, as Attending Veterinarian for both TAMHSC and Scott & White, Dr. Lane was assigned "program authority and responsibility for the [each] Institution[s'] animal care and use program[s]," an authority subsequently granted to Dr. Blackwood in her appointment as interim Attending Veterinarian.[52]

30.     Prior to July of 2011, Dr. Blackwood was the designated alternate for Dr. Lane and had "the authority to intervene in any procedure in the best interest of animal care in Dr. Lane's absence"[53] and "delegated authority and responsibility for [TAMHSC's] animal care and use program whenever Dr. Lane [wa]s unavailable."[54]

31.     Although TAMHSC and Scott & White had two nominally distinct IACUCs, they were identical and operated as one.[55]  The jointly-issued IACUC Resource Binder incorporating AWA and provided to Plaintiffs characterizes the IACUC as having three components: Scott & White, TAMHSC, and the VA.[56]  The IACUCs were composed of the same members, operated out of the same offices with the same support staff, and met at the same times.[57]  Distinct resolutions and minutes were maintained, but only one discussion would take place; one IACUC would

---

[51] Ex. 24 DCM Director/Attending Veterinarian Job Description
[52] Ex. 5, Scott & White Assurance at § III.B; Ex. 28 TAMHSC Assurance at § II.B.
[53] Ex. 5, S&W Assurance at § III.B.
[54] Ex. 29 TAMHSC Assurance at § II.B
[55] Ex. 15 Lane Dec. ¶ 6; Ex. 14 Blackwood Dec. ¶ 6; Ex. 17 Beswick Dep. 192:4-16; Ex. 18 Wesson Dep. 50:11-22.
[56] Ex. 3 IACUC Resource Binder at Plaintiffs 02041-42.
[57] *See* Ex. 15 Lane Dec. ¶ 6; Ex. 14 Blackwood Dec. ¶ 6; Ex. 3 IACUC Resource Binder at Plaintiffs 02038; Ex. 17 Beswick Dep. 192:4-16.

simply adopt the conclusions of the other.[58]   There was no need to have the same discussion amongst the same persons twice.   The Scott & White IACUC was responsible for and would review and evaluate research supported though grants issued to both TAMHSC-paid researchers and Scott & White or VA-paid researchers.[59]   The program description provided to AAALAC provides as follows:

> Scott and White, TAMHSC and CVTHSC Clinicians and Basic science faculty work mutually to promote and bridge institutionally relevant animal research.   The Animal Care and Use Program at Scott & White supplements research and training activities for the above partners by maintaining animal subjects in an optimally located facility thereby maximizing researcher accessibility.   The [Scott & White IACUC] reviews all research conducted on the Scott & White campus.   This includes TAMHSC and CTVHSC research protocols as all animal activities are coordinated through the Scott & White DCM.[60]

32.     There was no variation in the services Plaintiffs provided to TAMHSC-funded researchers versus those provided to Scott & White-funded researchers.[61]

### III.     Defendant Richard Beswick, PhD, MBA

33.     Plaintiffs' former supervisor, Defendant Richard Beswick, serves as Senior Vice President of Research for Scott & White and Assistant Dean for Research for the Division of Research & Education at the Temple Campus of the Texas A&M Health Science Center College of Medicine.[62]   He was responsible for all research conducted on the Scott & White Temple campus, whether performed by TAMHSC-paid researchers or Scott & White researchers.

34.     As Dean, Dr. Beswick "act[s] under the authority of [TAMHSC] and [is] accountable to the College for the conduct of [his] College of Medicine activities."[63]

---

[58] Ex. 15 Lane Dec. ¶ 6; Ex. 14 Blackwood Dec.¶ 6.
[59] Ex. 15 Lane Dec. ¶ 6; Ex. 14 Blackwood Dec.¶ 6.
[60] Ex. 36 Excepts of AALAC Program Description at  SW_LAN_84.
[61] Ex. 15 Lane Dec. ¶ 9; Ex. 14 Blackwood Dec. ¶ 9; Ex. 18 Wesson Dep.  47:1-4
[62]  Ex. 23 TAMHSC Beswick Appointment Letter.
[63]  Ex. 16 Affiliation Agreement p. 6.

35.    Although Defendants attempt to characterize Dr. Beswick's appointment as merely "complimentary" and essentially meaningless, the evidence reflects that he had real and substantial responsibilities.

36.    According to his TAMHSC appointment letter, as Dean, Dr. Beswick has "the primary responsibility for the research mission on the Temple Campus of TAHMHSC [College of Medicine]."[64]

> [Dr. Beswick's] responsibilities [as Dean] include enhancing excellence in and having administrative oversight over research on the Temple Campus under the direction of the TAMHSC COM Office of Research. . . . [A]lso, . . . the responsibility to enhance excellence and to oversee conduce of the overall research enterprise on the Temple Campus . . . [and] also . . . to proved overall all leadership and organization regarding our research mission on the Temple Campus.[65]

37.    Dr. Beswick supervised Plaintiffs with regard to all services provided, including services provided in connection with their TAMHSC appointments and services provided to TAMHSC researchers.[66]

38.    Dr. Beswick has express authority to utilize a joint TAMHSC/Scott & White letterhead in virtue of his joint appointment and when he was communicating regarding matters that effected both Scott & White and TAMHSC, for example regarding Dr. Blackwood's interim appointment at Attending Veterinarian to Scott & White and TAMHSC.[67]

39.    Dr. Beswick reported to Dr. Donald Wesson, in both his capacity as Scott & White employee and as Vice Dean of the TAMHSC Temple campus.[68]   Dr. Wesson himself held dual appointments with TAMHSC and Scott & White, serving as Vice Dean of the TAMHSC College

---

[64] Ex. 23 TAMHSC Beswick Appointment Letter.
[65] Ex. 23 TAMHSC Beswick Appointment Letter; Ex. 17 Beswick Dep. 40:19-41:5.
[66] Ex. 17 Beswick Dep. 99:19-100; Ex. 15 Lane Dec. ¶ 11, Ex. 14 Blackwood Dec. ¶ 11.
[67] Ex. 17 Beswick Dep. 281:16-25, 282:17-283:7,  285:1-5, 287:18-24; Ex. 8 TAMHSC/Scott & White Blackwood Appointment Letter.
[68] Ex. 23 Beswick TAMHSC Appointment Letter; Ex. __ Wesson Dep. 54:19-20.

of Medicine and Chief Academic Officer for Scott & White.[69]  Dr. Wesson had duties to all three organizations on the Temple campus.[70]  Dr. Wesson's duties as Dean were the same as his duties as Vice President of Research at Scott & White.[71]  Although Dr. Beswick conclusorily states that his own duties as Dean for TAMHSC vary from his duties as Senior Vice President at Scott & White, he identified the same duties for each role.[72]

### IV.    Defendant Beswick's Termination of Plaintiffs

40.    Dr. Beswick testified that he decided to terminate Dr. Blackwood and demote Dr. Lane after having spoken to Dr. David Dostal, TAMHSC faculty member and chair to both the TAMHSC and Scott & White IACUCs.[73]   He testified that Dr. Dostal had complained to him about the reports made by Plaintiffs at the May 2011 IACUC meeting[74] and that this prompted his decision to terminate Plaintiffs:

| | |
|---|---|
| Q: | And you were referring to the incident at the IACUC meeting that Dr. Dostal told you about? |
| Dr. Beswick: | Yes |
| Q: | So that was one of the reasons you wanted to demote and terminate, is that correct? |
| Dr. Beswick: | That was one of the many, many reasons.[75] |

---

[69] Ex. 35 S&W Wesson Directory Listing; Ex. 28 Wesson Position Specification at HSC 000933; Ex. 17 Beswick Dep. 187:24-188:4, 196:19-197:5.

[70] Ex. 28 Wesson Position Specification at HSC 000933; Ex. 37 Wesson Salary Agreement.

[71] Ex. 17 Beswick Dep. 166:4-8, 196:19-197:5.

[72] Ex. 17 Beswick Dep. 185:22-10, 195:8-9 ("Q: You testified earlier regarding your administrative appointment as dead discussing the establishment of per diem rates, bio safety . . . clinical trials within the system and basically doing anything that protects the facility."  Dr. Beswick:  "Correct."  Q:  "Are those the same as the duties that you perform as [Scott & White] senior vice-president for Division of Research and Education?" Dr. Beswick: Yes.")

[73] Ex. 17 Beswick Dep. 283:23-284:25; Ex. 8 TAMHSC/Scott & White Blackwood Appointment Letter from D. Dostal.

[74] Ex. 17 Beswick Dep. 61:1-22, 65:10-66:12, 72:3-16, 73:15-20, 87:10-88:4.

[75] Ex. 17 Beswick Dep. 87:10-88:4.

41.     This is a damning admission that Plaintiffs' termination was clearly related to the reporting of animal welfare violations.  No amount of fancy footwork or remodeling of the facts can change this simple truth:  Plaintiffs were fired for doing what they were hired to do.

42.     After receiving Dr. Dostal's report, Dr. Beswick failed to conduct a proper investigation into the events of the IACUC meeting prior to terminating Plaintiffs.[76]  No opportunity to rebut any charge was provided to Plaintiffs.[77]  There is nothing in Plaintiffs' employment file to suggest poor performance.

43.     Defendant Beswick consulted with Dr. Wesson and Scott & White human resource personnel, Ms. Bambi Hester, and both approved and sanctioned Dr. Beswick's decision to terminate the Plaintiffs.[78]

44.     On July 5, 2011, Defendant Beswick approached Dr. Lane, cited the May 2011 IACUC meeting, and informed Dr. Lane that Dr. Blackwood was going to be terminated and that she was going to be removed from her positions.[79]  Dr. Lane was very concerned for Dr. Blackwood, as she was expecting her first child in just a few months and was the primary earner in her household.[80]  Dr. Lane had an offer from Harvard, but had not made any decisions about the matter.[81]  She presented a hypothetical to Dr. Beswick and asked that *if* she resigned, would they consider keeping Dr. Blackwood on in her position.[82]  Dr. Beswick answered in the negative and stated that Dr. Blackwood was "a bigger problem than" Dr. Lane.[83]

---

[76] Ex. 17 Beswick Dep. 223: 20-25.
[77] Ex. 17 Beswick Dep. 227:11-13; Ex. 14 Blackwood Dec. ¶ 14.
[78] Ex. 17 Dep. Beswick 74:7-24, 75:13-16, 76:7-8; 87:10-88:4, 211:3-11; Ex. 18 Wesson Dep. 74:16-76:9, *see also* Ex. 18 Wesson Dep. 43:8-19; 56:10-23.
[79] Ex. 17 Dep. Beswick 213:11-14; Ex. 15 Lane Dec. ¶ 13.
[80] Ex. 15 Lane Dec. ¶ 13.
[81] Ex. 15 Lane Dec. ¶¶ 13, 15.
[82] Ex. 17 Beswick Dep. 108:17-109:9; Ex. 15 Lane Dec. ¶¶ 13, 15.
[83] Ex. 15 Lane Dec. ¶ 13.

45.     Later that day, Defendant Beswick met with Dr. Blackwood and Dr. Lane and told Dr. Blackwood that she was being terminated, but that her last day would be three months past her maternity leave.[84]

46.     Dr. Lane later made inquiries regarding the details of the demotion.[85]   Dr. Beswick responded by stating that her verbal resignation had been accepted and that he needed her last day.[86]  Dr. Lane told Dr. Beswick that she had not resigned; she never submitted a signed writing communicating her resignations as provided for in the Senior Staff Handbook which governed her employment.[87]   Dr.  Beswick insisted on having her last day, and on July 15, 2011, Dr. Lane was asked to leave the premises.[88]

47.     That same day Dr. Blackwood met with Dr. Beswick and he asked her to take on Dr. Lane's duties on an interim basis.[89]  He told her that she was still being terminated, but that if the researcher's learned to accept her, he might change his mind.[90]  As reflected in the transcript of that July 15, 2011 meeting, Dr. Beswick expressly told Dr. Blackwood that she was too aggressive and that she needed to be gentler with the researchers:

> Dr. Beswick:     [T]he interactions that I've had with the investigators that are out there, as well as the folks on the IACUC . . . they've said that you're very, very aggressive with the investigators. . . . I don't know the specifics because I'm not there.  I'm not at the IACUC meetings.  . . . I ask that you just be a little gentler with them.  You know. . . . I've always stressed that to Jennifer, also.  I said, "Don't be a hindrance.  If there is something that is compliance-related, then you really step in and you say, 'No, you cannot do that.'"   Yes you guys have been

---

[84] Ex. 15 Lane Dec. ¶ 13;  Ex. 14 Blackwood Dec.¶ 13; Ex. 30 July 5, 2011 Recording Transcript (Plaintiffs 01954).
[85] Ex. 15 Lane Dec. ¶ 15.
[86] Ex. 15 Lane Dec. ¶ 15; *See also* Ex. 17 Beswick Dep. 108:17-109:9
[87] Ex. 15 Lane Dec. ¶¶ 14, 15; Ex. 9 Senior Staff Handbook at Plaintiffs 01098.
[88] Ex. 15 Lane Dec. ¶¶ 15, 17.
[89] Ex. 31 July 15, 2011 Meeting Transcript (Plaintiffs 01953) 10:16-17, 19; 11:5-11; Ex. 14 Blackwood Dec. ¶ 15; *see also* Ex. 8 TAMHSC/Scott & White Blackwood Appointment Letter; Ex. 6 Email from R. Beswick to B. Blackwood (July 21, 2011); Ex. 8 TAMHSC/Scott & White Blackwood Appointment Letter from D. Dostal.
[90] Ex. 31 July 15, 2011 Meeting Transcript (Plaintiffs 01953) 10:16-17, 19; 11:5-11; Ex. 14 Blackwood Dec. ¶ 15.

|                | doing that, but . . .  it's kind of like, it's been done very, very, very aggressively overall. |
|----------------|---|
| Dr. Blackwood: | So . . . obviously I was let go.  That's ultimately still the terms of the agreement. . . Is that correct? |
| Dr. Beswick:   | . . . I'm willing to go into the laws that be or whoever [sic] to have that possibly reconsidered, if we get through this next few months with you—with them accepting you.  Do you understand what I am sayin'? |
| Dr. Blackwood: | With them accepting — "them" being the researchers accepting me. |
| Dr. Beswick:   | The researchers accepting you.[91] |

48.    Dr. Blackwood took on the additional duties, but demanded additional compensation. Scott & White accepted the benefits but has failed to pay Plaintiff Blackwood.

### V.    Modification of Plaintiffs' At-Will Employment

49.    Plaintiffs were engaged as Senior Staff and provided with the Senior Staff Handbook upon their engagement.  "Senior Staff" are employed on distinct terms from staff generally at Scott & White.[92]

50.    The Senior Staff Handbook contains no provision stating that the at-will employment relationship cannot be modified or specifying that it must be modified in a signed writing.[93]  The only discussion of termination states that Senior Staff should resign in writing with 60 days notice.[94]    In accordance with federal law and the Assurance provided to federal authorities,[95] Scott & White promised not only Plaintiffs but the United States Government that Plaintiffs would not suffer retaliation or reprisals for reporting violations of animal welfare law or policy.

---

[91]   Ex. 31 July 15, 2011 Meeting Transcript (Plaintiffs 01953) 10:16-17, 19; 11:5-11; Ex. 18 Wesson Dep. 58:9-18 (testifying that plaintiffs went overboard with their animal care responsibilities).
[92] Ex. 18 Wesson Dep. 39:18-40:11.
[93] Ex. 9 Senior Staff Handbook.
[94]   Ex. 9 Senior Staff Handbook at Plaintiffs 01098.
[95]   9 C.F.R. § 2.32(c)(4); Ex. 5, Scott & White Assurance at preamble and § II.

51.     Scott & White delivered to Drs. Lane and Blackwood a one-page memorandum that in pertinent parts reads as follows:

> Problem Resolution Process for Animal Care and Use Program
>
> Scott & White expects all staff to use good judgment when making decisions regarding compliance issues for animal care and use. The NIH Guide and Scott & White Assurances provides broad direction for doing this. . . .
>
> If you believe that a violation of policy or law was committed, you are obligated to report it. Such issues should be raised to your immediate supervisor, the Chair of the IACUC, Attending Veterinarian or Chief Institutional Official. . . . If you believe the issue is not properly addressed, you must take your concern to the next level of management.
>
> To encourage appropriate _use of this reporting procedure_, Scott & White has a non-retaliation policy that _strictly prohibits any kind of retaliation or retribution_ against any employee who, in good faith, contacts their supervisor or institutional officials.  All staff are treated with dignity and respect. [96]

52.     Additionally, the IACUC Resource Binder provided to Plaintiffs stated as follows:

> An individual reporting a concern will be provided protection against reprisals as required under the Animal Welfare Act.[97]

53.     This non-retaliation policy (hereinafter "Animal Welfare Non-Retaliation Policy") was also posted in the vast majority—if not all—of animal laboratory and housing areas on the Temple campus.[98]  Plaintiffs saw this policy every day they went to work at the Temple campus during the entire course of their employment.[99]  The policy contains no disclaimer stating that no contractual rights are being created, but rather invites reliance.[100]

---

[96]  Ex. 10 Animal Welfare Non-Retaliation Policy.
[97]  Ex. 3 IACUC Resource Binder at Plaintiffs 02047.
[98]  Ex. 15 Lane Dec. ¶ 20; Ex. 14 Blackwood Dec. ¶ 22.
[99]  Ex. 15 Lane Dec.¶ 20; Ex. 14 Blackwood Dec. ¶ 22.
[100]  Ex. 10 Animal Welfare Non-Retaliation Policy

54.    Plaintiffs were never provided with the "Scott & White Healthcare Nature of Employment/Termination" attached as Exhibit A to Defendants' Motions.  Defendants claim that this document was posted on a Scott & White website, but Plaintiffs never viewed it nor were they directed to the website.[101]    Scott & White never gave Plaintiffs notice of this policy as a term of Plaintiffs' employment and they never assented to it, neither expressly nor implicitly.[102] Additionally, it is unclear that this policy has any application to Plaintiffs as it doesn't mention "Senior Staff" and does not mention "Scott & White Clinic" employees.

## ARUGMENTS AND AUTHORITIES

### I.    Summary Judgment Burdens and Standards

55.    "Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. . . . The movant has the burden of showing that summary judgment is appropriate."[103] A defendant moving for summary judgment must direct the court to an essential element of the plaintiff's claim and demonstrate that the evidence is insufficient to raise a genuine issue of fact.[104]   After the movant satisfies this burden, the non-movant must come forward with specific facts showing a genuine issue for trial.[105]

56.    "A court 'may not make credibility determinations or weigh the evidence' in ruling on a motion for summary judgment."[106]   "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."[107]

---

[101] Ex. 15 Lane Dec. ¶ 18; Ex. 14 Blackwood Dec. ¶ 20.
[102] Ex. 15 Lane Dec. ¶¶ 18-19; Ex. 14 Blackwood Dec. ¶¶ 20-21.
1.            [103] *Thomas v. EMC Mortg. Corp.*, 499 Fed. Appx. 337, 340 (5th Cir. 2012).

[104] *CeloTex Corp. v. Catrett,* 477 U.S. 317, 331 (1986).
[105] *Matsushita Elec. Industrial Co. v. Zenith Radio,* 475 U.S. at 574, 587 (1986).
[106] *Bd. of Regents, Univ. of Tex. Sys. ex rel. Univ. of Tex. at Austin v. KST Elec., Ltd.*, 550 F. Supp. 2d 657, 663 (W.D. Tex. 2008)
[107] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

57.     All reasonable doubts as to the existence of a genuine issue of material fact must be resolved against the movant and all inferences from the factual record must be drawn in the light most favorable to the non-moving party.[108]

## II.     The Scott & White Defendants May Be Found Liable under Section 1983

58.     "The Fifth Circuit has indicated that a corporation can be liable under § 1983 if there is a showing of official sanction or 'imprimatur' of the conduct or practice at issue."[109]

59.     Official sanction can be found when a corporation acquiesces or participates in the conduct of its agent.[110]

60.     Prior to terminating Plaintiffs, Defendant Beswick consulted with his supervisor, Dr. Wesson and human resources personnel, Ms. Bambi Hester, and both approved of his course without concern for Plaintiffs' constitutional rights.[111]   This is sufficient to find the Scott & White Defendants liable under Section 1983.[112]

## III.     Defendants' Conduct is Fairly Attributable to the State

61.     There is no one conclusive test by which state action can be determined; rather it is fact-intensive inquiry dependant on the context and the circumstance of the given case.

---

[108] *Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 456 n. 11 (5th Cir. 1994); *Tex. Mut. Ins. Co. v. Wood Energy Group, Inc.,* 604 F. Supp. 2d 942, 949 (W.D. Tex. 2009).
[109] *Eldridge v. CCA Dawson State Jail,* 3:04-CV-1312-M, 2004 WL 1873035 (N.D. Tex. Aug. 19, 2004) *report and recommendation adopted,* CIV.A.3:04-CV-1312 M, 2004 WL 2075423 (N.D. Tex. Sept. 16, 2004); *Brown,* 1999 WL 33290666; *see also Rosborough v. Mgmt. & Training Corp.,* 350 F.3d 459, 461 (5th Cir. 2003) (holding private corporation liable under § 1983).
[110] *Auster Oil & Gas, Inc.,* 835 F.2d at 602 ("[W]e find that the jury could have properly concluded that Spook Stream acquiesced in Carmouche's plans and was directly involved in the operation.  As a result, his assertion that the jury improperly based his culpability solely on vicarious liability is groundless. . . . Because the record also shows that Stream was acting at all material times in his capacity as either vice-president and/or secretary of M.G.S., his actions constitute the official imprimatur needed to hold the corporation liable under § 1983.").
[111] Ex. 17 Dep. Beswick 74:7-24, 75:13-16, 76:7-8, 87:10-88:4, 211:3-11; Ex. 18 Wesson Dep. 74:16-76:9, *see also* Ex. 18 Wesson Dep. 43:8-19; 56:10-23.
[112] *Auster Oil & Gas, Inc.,* 835 F.2d at 602.

62.   The  United States Supreme Court has *expressly rejected* the notion that there can be any rigid criteria:

> What [nominally private conduct] is fairly attributable [to the State] is a matter of normative judgment, and the criteria lack rigid simplicity.   From the range of circumstances that could point toward the State behind an individual face, no one fact can function as a necessary condition across the board for finding state action.[113]

63.   The "nexus" or "state action test" considers whether the State has inserted "itself into a position of interdependence with the [private actor, such] that it was a joint participant in the enterprise"[114]

64.   "[U]nder the 'joint action test', private actors will be considered state actors where they are 'willful participant[s] in joint action with the State or its agents.'"[115]

65.   Additionally, "[p]ervasive entwinement of public institutions and public officials in [a private entity's] composition and workings . . . will support a conclusion that an ostensibly private organization ought to be charged with a public character and judged by constitutional standards."[116]

66.   "[A] conclusion of state action under the criteria of entwinement [is] in no sense unsettled merely because other criteria of state action may not be satisfied by the same facts. . . . When . . . the relevant facts show pervasive entwinement to the point of identity, the implication of state action is not effected by pointing out that the facts might not loom large under a different test."[117]

---

[113] *Brentwood Acad.  v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295-96 (2001).
[114] *Cornish v. Corr. Services Corp.*, 402 F.3d 545, 550 (5th Cir. 2005).
[115] *Id.*
[116] *Brentwood Acad.*, 531 U.S. at 298, 302.
[117] *Id.* at 302-303.

## A.  State Action is Satisfied Under the Entwinement Test

67.     Defendants do not address the pervasive entwinement of TAMHSC and Scott & White as a basis for finding state action.   As reflected in the detail provided above and incorporated herein, the laboratory animal research programs at TAMHSC and Scott & White are thoroughly integrated to the point of identity.   Even discounting the extensive in some of the educational aspects operations of the medical school and just look at the animal laboratory context, the pervasive entwinement justifies the imposition of the constitutional standard.   The entwinement is evidenced by the extensive overlap and identity details and supported in the Fact section above and in the Plaintiffs' declarations.[118]   The animal laboratory research programs are identical: the same administrators, the same veterinarians, the same IACUCs, the same administrative support staff, the same centralized, and the same researchers with dual appointments.

## B.      The Actions Complained of Are Fairly Attributable to the State.

68.     Defendants argue that the joint action and nexus tests cannot be satisfied because Defendant Beswick was allegedly only acting in his capacity as an agent of Scott & White Clinic when he terminated Plaintiffs and that TAMHSC did not participate.   This is simply not true.

69.     Despite his protests, Dr. Beswick's duties as Dean encompass the decision to terminate Plaintiffs.[119]   Dr. Beswick supervised Plaintiffs with regard to all services they provided on the Temple campus, whether related to TAMHSC or Scott & White-funded research.[120] Dr. Beswick further testified that the appointment of the attending veterinarian was a matter that related to both TAMHSC and Scott & White.[121]

---

[118] *Supra* pp. 10-16 and exhibits cited therein; Ex. 14 Blackwood Dec. ¶¶ 4, 6-9, 11; Ex. 15 Lane Dec. ¶¶ 4, 6-9, 11.
[119] *See* Ex. 23 Beswick TAMHSC Appointment Letter; *see also* Ex. 15 Lane Dec. ¶¶ 11, 17; Ex. 14 Blackwood Dec. ¶¶ 11, 18.
[120] Ex. 17 Beswick Dep. 99:19-100; Ex. 15 Lane Dec. ¶¶ 11, 17; Ex. 14 Blackwood Dec. ¶¶ 11, 18.
[121] *See* Ex. 17 Beswick Dep. 285:1-10

70.    Dr. Beswick's decision resulted to terminate Plaintiffs had the direct consequence of

terminating them from their TAMHSC positions, a fact expressly acknowledged by Dr. Beswick:

| | |
|---|---|
| Dr. Beswick: | I terminated [Dr. Blackwood] from her position at Scott & White and any appointments that she had as Texas A&M. . . . |
| Q: | When you terminated Dr. Blackwood, you terminated her from her appointment as senior veterinarian for the Texas A&M Health Science Center, Temple Campus; is that correct? |
| Dr. Beswick: | That would be yes. |
| Q: | When you communicated to Dr. Lane that she was no longer going to be attending veterinarian did that encompass her position at Texas A&M? |
| Dr. Beswick: | Yes. . . . |
| Dr. Beswick: | I was telling [Dr. Lane] that she would not be the attending veterinarian for Scott and White . . . [T]hat meant that her appointment also with Texas A&M would be terminated. . . . |
| Q: | . . . [Y]ou've testified that in virtue of dismissing her from [her Scott & White] position she would no longer be the Texas A&M attending veterinarian.  Correct? |
| Dr. Beswick: | Correct. . . . |
| Q: | Is that true? |
| Dr. Beswick: | She would no longer be the Texas A&M attending veterinarian because she was dismissed from her Scott and White position. [122] |

71.    Defendants cannot gloss over the fact that Plaintiffs lost their positions at a state facility

when they were terminated by a state actor.

---

[122] Ex. 17 Beswick Dep. 101:3-5, 9-13; 214:6:-10, 215:13-17, 216:7-9, 216:13, 216:15-17.

72.     Furthermore, TAMHSC had a direct role and clearly influenced the termination decisions. Defendant Beswick's termination decisions were made just after to receiving complaints from Scott & White and TAMHSC IACUC chair (and TAMHSC employee),[123] Dr. David Dostal, regarding Plaintiffs' reports at the May 2011 IACUC meeting and Dr. Beswick identified this as a reason for the termination.[124] Furthermore, the complaint was about reports concerning a TAMHSC-paid researcher.[125]

73.     The inference is apparent and credible; Dr. Dostal's complaint about Plaintiffs' May 2011 reports to the IACUC prompted the termination decision. Thus, TAMHSC is directly implicated in the decision to terminate Plaintiffs in violation of their contractual rights.

74.     Additionally, Dr. Beswick cited complaints from the Temple Principal Investigators Council ("TPIC"), a group encompassing both Scott & White-paid and TAMHSC paid-researcher, as reasons for the Plaintiffs' termination.[126] Defendants' hair-splitting arguments simply do not fit the facts.

### IV.     Defendant Beswick is Not Entitled to Qualified Immunity

75.     "The law is not established in this circuit . . . as to whether private entities such as these are entitled to the protections of qualified immunity."[127] The Supreme Court however has made clear that the defense of qualified immunity is not typically available to employees of private entities who are nonetheless liable under Section 1983 because their conduct is fairly attributable to the state.[128] The Supreme Court has held that the defense should only be extended upon a

---

[123] Ex. 17 Beswick Dep. 283:23-284:25; Ex. 8 TAMHSC/Scott & White Blackwood Appointment Letter from D. Dostal.

[124] Ex. 17 Beswick Dep. 61:1-22, 65:10-66:12, 72:3-16, 73:15-20, 87:10-88:4.

[125] Ex. 17 Beswick Dep. 194:8-14.

[126] Ex. 30 Transcript of July 5, 2011 Recording 3:8-9. "The TPIC consists of individuals nominated and elected by the Temple Principal Investigators (PIs) to represent the PIs of the [TAMHSC, Scott & White, and the VA.]" Exs. 1 and 2 Temple Principle Investigators Council Documents at SW__LAN__1245

[127] *Walter v. Horseshoe Entm't*, 483 Fed. Appx. 884, 886 (5th Cir. 2012).

[128] *Richardson*, 521 U.S. at 412 (holding private prison guard not entitled to qualified immunity for § 1983 liability);

demonstration of firmly rooted historical support in the common law and strong policy reasons.[129]   The policy reasons to be considered are whether failure to extend immunity would encourage unwarranted timidity.[130]   "[U]nwarranted timidity is less likely present, or at least is not special, when a private company [is] subject to competitive market pressures."[131] Competitive pressures alleviate concerns about timidity because they will likely be replaced if they are ineffective at the job.   Following this analysis, other courts have declined to extend qualified immunity to the employees of private entities.[132]

76.   There is neither a historical precedent nor anything special about this industry which would justify the extension of qualified immunity to these actors.   Regardless, Defendant Beswick would not be entitled to qualified immunity even if it applied because his conduct was

---

*see also See U.S. ex rel. Barron*, 381 F.3d at 443 ("[P]erformance of state functions alone is insufficient to create immunity. . . . [T]he Supreme Court has demonstrated its willingness to allow disparate treatment for state and private employees performing the same functions. ") (citing *Richardson*).

[129] *Richardson*, 521 U.S. at 403 (1997) ("This Court has nonetheless accorded immunity where a 'tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that 'Congress would have specifically so provided had it wished to abolish the doctrine.'"); *see also McCullum v. Tepe*, 693 F.3d 696, 700 (6th Cir. 2012) ("when a private party—including a private person working for the government part-time, . . . seeks qualified immunity from a § 1983 suit, we determine whether: (1) there was a firmly rooted history of immunity for similarly situated parties at common law; and (2) whether granting immunity would be consistent with the history and purpose of § 1983.").

[130] *Richardson*, 521 U.S. at 408.

[131] *Id.* at 409.

[132] *E.g. McCullum*, 693 F.3d at 704 ("We acknowledge that it is somewhat odd for a government actor to lose the right to assert qualified immunity, not because his job changed, but because a private entity, rather than the government, issued his paycheck. But just as market pressures, a private firm's ability to 'offset any increased employee liability risk with higher pay or extra benefits,' . . . , the "continual ... need for deterring constitutional violations[,] and ... [the] sense that the [private] firm's tasks are not enormously different in respect to their importance from various other publicly important tasks carried out by private firms,' . . . , vitiated any policy-based concerns in *Richardson,* these same factors suggest that immunity would be inappropriate here."); *Harrison v. Ash*, 539 F.3d 510, 524 (6th Cir. 2008) ("[W]e find that the purposes of qualified immunity do not support the extension of the doctrine to nurses employed by a private medical provider. With respect to unwarranted timidity, the most important rationale underlying qualified immunity, it is clear that market forces will operate to insure that CMS and its employees will effectively execute their contractual duties."); *Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc.*, 413 F.3d 1163, 1169 (10th Cir. 2005) (private community disability service provider not entitled to qualified immunity); *Malinowski v. DeLuca*, 177 F.3d 623, 627 (7th Cir. 1999) (private building inspector not entitled to qualified immunity) ("We note in the case under consideration that the defendants-appellants have failed to cite any cases or historical evidence to lend support to the notion that private building inspectors have historically enjoyed qualified immunity. . . . [Defendants] have failed to establish, as under *Richardson,* anything 'special enough about the job or about its organizational structure that would warrant' an extension of governmental immunity.").

not objectively reasonable.  Plaintiffs had a constitutionally property interest in continued employment because their employment contracts were subject to the non-retaliation policy under clearly established law.[133]  Furthermore, Dr. Beswick conducted no investigation of the alleged IACUC incident which prompted Plaintiffs' termination and never even inquired with Dr. Blackwood about the matter.  Thus, well aware of the federal prohibitions regarding non-retaliation for reporting animal welfare violations, not to mention the ubiquitously posted Animal Welfare Non-Retaliation Policy, he terminated Plaintiffs in response to a complaint about a report of deviation made at an IACUC meeting.  As stated earlier, nothing in Plaintiffs' personnel file supports anything but a finding of improper retaliation.

## V.   The Animal Welfare Non-Retaliation Policy Modified Plaintiffs' At-Will Employment

77.   "At-will employment may be modified by contract or by express rules or policies."[134] Modification and terms of at-will employment contracts are determined under generally applicable principles of contract law.[135]  "[T]he instrument alone will be deemed to express the intention of the parties for it is objective, not subjective, intent that controls."[136]

78.   Under Texas law, the at-will relationship may be modified by a writing that "specifically and expressly curtails the employer's right to terminate the employee . . .  in a meaningful and special way."[137]

---

[133] *Vida* , 885 S.W.2d 177.
[134] *Treadway v. Holder*, 309 S.W.3d 780, 783 (Tex. App.—Austin 2010, pet. denied); *see also Hathaway v. Gen. Mills, Inc.*, 711 S.W.2d 227, 229 (Tex. 1986).
[135] *Stephens v. Dallas Area Rapid Transit*, 50 S.W.3d 621, 630 (Tex. App.—Dallas 2001, pet. denied)
[136]  *Matagorda Cnty Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006).
[137] *Vida*, 885 S.W.2d 177.

79.     In *Vida*, the El Paso court of appeals held as follows:

> Here the credit union manual contains a provision specifically and expressly promising that "[n]o employee shall be penalized for using the grievance procedure."  We find that this provision limits the employer's termination rights in a narrow, clearly delineated way.  . . . [T]he employer made a specific pledge that it would not terminate (or otherwise retaliate against) an employee for a single, particular reason. We believe the assurance in this employee handbook meets the test of specific, express limitation that alters the at-will relationship in a meaningful way.[138]

80.     The Animal Welfare Non-Retaliation Policy specifically protects those who report violations by ***strictly*** prohibiting ***any kind*** of retaliation or retribution for reporting animal welfare violations.[139]  "An individual reporting a concern will be provided protection against reprisals as required under the Animal Welfare Act."[140]

81.     As was the case in *Vida*, Scott & White "made a specific pledge that it would not terminate (or otherwise retaliate against) an employee for a single, particular reason," reporting animal welfare violations. "[This] assurance . . . meets the test of specific, express limitation that alters the at-will relationship in a meaningful way."[141]   The ***strict prohibition*** in the Animal Welfare Non-Retaliation Policy that identifies a specific reason for which Plaintiffs could not be terminated, can be distinguished from the general integrity policy in *Durkel v. St. Joseph Hospital*, the case on which Defendants' rely.[142]

---

[138] *Id.* at 748 (reversing trial court's granting of summary judgment in employer's favor); *see also Goodyear Tire & Rubber Co. v. Portilla,* 879 S.W.2d 47, 48 n. 1 (Tex. 1994) ("When Goodyear agreed not to fire Portilla on the basis of violation of its anti-nepotism policy, Goodyear limited its ability to terminate at its will, thus removing the employment relationship from the at will category."); *Scott v. Merck & Co., Inc.*, CIV. L-09-3271, 2010 WL 4941994, * 5 (D. Md. Nov. 30, 2010) ("The promise that employees will be protected from retaliation for reporting business practice issues in good faith, and that such reporting may not be the basis for demotion, denial of benefits, or termination, is sufficiently specific and definite to constitute an enforceable promise under the *Staggs* framework.") (applying similar Maryland common law regarding modification of at-will employment).
[139] Ex. 10 Animal Welfare Non-Retaliation Policy; *see also* Ex. 18 Wesson Dep. 134:25-135:4.
[140] Ex. 3 IACUC Resource Binder at Plaintiffs 02047.
[141] *Vida*, 885 S.W.3d at 748; *see also Goodyear Tire & Rubber Co. v. Portilla,* 879 S.W.2d 47, 48 n. 1 (Tex. 1994); *Scott*, 2010 WL 4941994, * 5.
[142] *Durkel v. St. Joseph Hosp.*, 78 S.W.3d 576 (Tex. App.—Houston[14th Dist.] 2002, no pet.).

### A. The "Scott & White Healthcare Nature of Employment/Termination" Policy Was Not a Term of Plaintiffs' Employment

82.     Defendants attempt to distinguish this case from *Vida* by reliance on the "Scott & White Healthcare Nature of Employment/Termination."[143]  This argument must fail because there is no evidence that Plaintiffs ever received notice of this alleged term of their employment and therefore never could have assented to it.[144] Additionally, such a disclaimer is excluded from the Senior Staff Handbook, which applied to Plaintiffs.[145]

83.     For the disclaimer in the "Scott & White Healthcare Nature of Employment/Termination" to have be considered an agreed upon term of Plaintiffs' employment, Defendants must demonstrate that Plaintiffs had notice of the term.[146]

84.     "To prove notice, an employer . . . must prove that he unequivocally notified the employee of definite changes in employment terms. . . . Fairness also dictates this rule. To have knowledge of a modification, the employee must know the nature of the changes and the certainty of their imposition."[147]

85.     In all but one of the cases on which Defendants rely (which did not address the issue),[148] the courts either (a) noted evidence of the employee's notice of the no-at-will modification or no-contract disclaimer (usually an acknowledgement signed by the employee);[149] (b) made a finding

---

[143] *See* Exhibit A to the Scott & White Defendants' Motion for Summary Judgment (Dkt. 48-1) and Defendant Dr. Richard Beswick's Motion for Summary Judgment (Dkt. 46-1).

[144] Ex. 15 Lane Dec. ¶¶ 18-19

[145] Ex. 9 Senior Staff Handbook at Plaintiffs 01098.

[146] *See In re Dillards Dept. Stores Inc.*, 198 S.W.3d 778, 780 (Tex. 2006) (notice is required to alter the terms of the at-will employment); *Hathaway*, 711 S.W.2d at 229 ("The party asserting the modification still must prove that the other party agreed to modify the employment terms."); *Moran v. Ceiling Fans Direct, Inc.*, CIVA H-06-0813, 2006 WL 2478837, *3 (S.D. Tex. Aug. 25, 2006) *aff'd*, 239 Fed. Appx. 931 (5th Cir. 2007) (provision found not to be part at-will employment agreement when movant failed to demonstrate adequate notice to plaintiffs.); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 19 (1981) ("The conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.").

[147] *Hathaway*, 711 S.W.2d at 229.

[148] *Jordan v. Jefferson Cty*, 153 S.W.3d 670, 675 (Tex. App.—Amarillo 2004, pet. denied) (notice not discussed).

[149] *Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 851 (5th Cir. 1999) ("Columbia's Employee Handbook,

---

that the employee did in fact have notice;[150] or (c) such notice was evident because the disclaimer appeared in the same document as the policy on which the employee relied.[151]

86.    Defendants present *no* evidence that Plaintiffs ever received this document or any such policy.   Indeed, Plaintiffs did not receive the document, were never directed to the website to view said document, and were never otherwise told that Scott & White's ability to terminate them could only be limited in a writing signed by them and CEO or President.[152]

87.    Even if they had been provided with the "Scott & White Healthcare Nature of Employment/Termination" document, it is unclear that it would apply to Plaintiffs.  Plaintiffs were Senior Staff not just "staff" and testimony establishes that Senior Staff and staff were distinct.[153]   The Senior Staff Handbook says nothing about any restriction on the manner in which the Plaintiffs' at-will employment may be modified.[154]  Indeed such a disclaimer is conspicuously absent from the Senior Staff Handbook's discussion of termination.[155]   "[T]he principle of *expressio unius est exclusio alterius* counsels us that 'the expression in a contract of

---

*which Zenor received* in 1991 when he began his employment, emphasized the at-will nature of Zenor's employment and stated that employees could be fired any time and for any reason not prohibited by law..").

[150] *Fed. Exp. Corp. v. Dutschmann*, 846 S.W.2d 282, 283 (Tex. 1993) (employee signed an agreement acknowledging the fact that she had received the handbook. The employee also acknowledged that the handbook was not a contract and that it did not alter her status as an at-will employee); *City of Comanche v. Florence*, 11-06-00285-CV, 2007 WL 2390781 (Tex. App.—Eastland Aug. 23, 2007, no pet.) (same) *Stiver v. Tex. Instruments, Inc.*, 750 S.W.2d 843, 845 (Tex. App.—Houston [14th Dist.] 1988, no writ) (same); *Beaubouef v. Phillips Petroleum Co.*, 147 F. Supp. 2d 654, 655 (S.D. Tex. 2001) (same); *Conway v. Saudi Arabian Oil Co.*, 867 F. Supp. 539, 541 (S.D. Tex. 1994) (employee signed and return an agreement acknowledging at-will employment and providing for modification only by signed writing); *Dethrow v. Parkland Health Hosp. Sys.*, No. Civ. A 300CV2126D, 2002 WL 413905, * 3 (N.D. Tex. Mar. 11, 2001) (plaintiff signed various acknowledgments of receipt of various handbooks, manuals and policies and that the received handbooks, handbooks, manuals, and policies did not constitute a contract).

[151] *Murphy v. Gulf States Toyota Inc.*, No. 01-00-00740-CV, 2001 WL 619557, at *1-2 (Tex. App.—Houston [1st Dist.] June 7, 2001, no pet.) (disclaimer was in the very same manual as the employment policy the plaintiff was attempting to enforce); *Almazan v. United Services Auto. Ass'n Inc.*, 840 S.W.2d 776 (Tex. App.—San Antonio 1992, writ denied) (identifying one manual with both the purported modification of the at-will doctrine and the disclaimer); *Garcia v. Reeves County Tex.*, 32 F.3d 200, 203 (5th Cir. 1999) (county personnel policy on which plaintiff relied contained express disclaimer that it did not constitute a contract).

[152] Ex. 15 Lane Dec. ¶¶18-20; Ex. 14 Blackwood Dec. ¶¶ 20-22.

[153] Ex. 18 Wesson Dep. 39:18-40:11; Ex. 17 Beswick Dep. 45:14-21.

[154] Ex. 9 Senior Staff Handbook.

[155] Ex. 9 Senior Staff Handbook at Plaintiffs 01098.

one or more things of a class implies the exclusion of all not expressed, even though all would have been implied had none been expressed."[156] Furthermore, Defendants allege that Plaintiffs had no relevant relationship with "Scott & White Healthcare" and "Scott & White Clinic" is not mentioned on the Scott & White Healthcare Nature of Employment/Termination."

### B. Guiding Business Principles Corporate Compliance Code of Conduct is Irrelevant

88.     The Guiding Business Principles Corporate Compliance Code of Conduct attached to Defendants' Motions as Exhibit B has no bearing on whether the Animal Welfare Non-Retaliation Policy was a term of Plaintiffs' employment limiting Scott & White's ability to terminate Plaintiffs.  Defendants fail to present any acknowledgment form as provided in the Guiding Business Principles to demonstrate the Plaintiffs did in fact receive this document and did not present any testimony stating that Plaintiffs were provided with it.[157]  Even if they could show delivery, the document only provides that the policies in that booklet do not establish a contract and that the booklets terms don't apply in every situation.[158]  Furthermore and perhaps more importantly, the Animal Welfare Non-Retaliation Policy does not incorporate the distinct and more general reporting procedures in the Guiding Business Principles Corporate Compliance Code of Conduct.[159]

### C. The Animal Welfare Non-Retaliation Policy Binds Scott & White

89.     Defendants challenge the Animal Welfare Non-Retaliation Policy as unauthorized and therefore incapable of binding Scott & White.  However, under Texas agency principles, the

---

[156] *A2D Technologies Inc. v. MJ Sys., Inc.*, 269 Fed. Appx. 537, 542 (5th Cir. 2008)

[157]     *See* Ex. 17 Beswick Dep. 97:3-5 (testifying that he does not know whether Plaintiffs' received the document); Guiding Business Principles Corporate Compliance Code of Conduct at SW__LAN__1275 (Dkts. 48-2, 46-2).

[158] Guiding Business Principles Corporate Compliance Code of Conduct at SW__LAN__1275 (Dkts. 48-2, 46-2)

[159] *One Beacon Ins. Co. v. Crowley Marine Services, Inc.*, 648 F.3d 258, 268 (5th Cir. 2011) ("[A] separate document will become part of the contract where the contract makes "clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt.") (applying Texas law); *Apex Fin. Corp. v. Brown*, 7 S.W.3d 820, 826 (Tex. App.—Texarkana 1999, no pet.) ("Specific terms of a contract will control over more general terms.").

Animal Welfare Non-Retaliation Policy is sufficient to bind Scott & White.

90.     Defendants identify the Animal Welfare Non-Retaliation Policy as a product of the IACUC.[160]  As a matter of federal law, the IACUC is an agent of the research facility.[161]  It is specifically tasked with implementing an animal care program and ensuring compliance with applicable federal standards, including the prohibition against retaliation.[162]  Thus, the IACUC was acting within its actual authority when it drafted and posted the Animal Welfare Non-Retaliation Policy altering the terms of Plaintiffs' employment.[163]

91.     Even if the IACUC did not have actual authority, it had apparent authority sufficient to bind Scott & White.[164]  By its very terms, the Animal Welfare Non-Retaliation Policy purports to establish Scott & White's policies, invites reliance, and contains no disclaimer stating that it does not alter the at-will relationship.[165]  Plaintiffs received proper notice of this Animal Welfare Non-Retaliation Policy and the IACUC Resource Binder accepted and relied on this policy as a term of employment.[166]  The policy was posted everywhere, Plaintiffs saw it every day and

---

[160] Scott & White Defendants' Motion for Summary Judgment p. 15 (Dkt. 48)

[161] 9 C.F.R. § 2.31(d)(vi)(B) (". . . the IACUC, as an agent of the research facility. . . "); *see also* Ex. 12 Glen M. Otto Dec. ¶ 4.

[162] Ex. 22 Excerpts of GUIDE p. 13 ("The primary oversight responsibilities in the Program rest with the IO, the AV, and the IACUC."); Ex. 12 Otto Dec. at ¶ 4, Report pp. 7-8.

[163] *Jarvis v. K&E ReOne LLC*, 390 S.W.3d 631, 639 (Tex. App.—Dallas 2012 no pet.) ("Actual authority usually denotes the authority a principal (1) intentionally confers upon an agent, (2) intentionally allows the agent to believe he possesses, or (3) by want of due care allows the agent to believe he possesses. . . . The existence of an agency relationship based on actual authority may be implied from the conduct of the parties or from the facts and circumstances surrounding the transaction in questions.").

[164] *Id.*("Apparent authority is based on estoppel, arising either from a principal knowingly permitted an agent to hold himself out as having authority or by a principal's actions which lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonable prudent to believe that the agent has the authority he purports to exercise.  Because the apparent authority is based on estoppel, the principal's conduct must be that which would lead a reasonably prudent person to believe that authority exists."); *v. Farrall & Blackwell Agency, Inc.*, 323 S.W.3d 278, 292 (Tex. App.—El Paso 2010, no pet.) ("The principal must have affirmatively held out the agent as possessing the authority or must have knowingly and voluntarily permitted the agent to act in an unauthorized manner.").

[165] Ex. 10 Animal Welfare Non-Retaliation Policy.

[166] *In re Dillards Dept. Stores Inc.*, 198 S.W.3d at 780 ("Notice is effective if it unequivocally communicates to the employee definite changes in the employment terms. . . . If the employee receives notice and continues working with knowledge of the modified employment terms, the employee accepts them as a matter of law."); Ex. 15 Lane Dec. ¶ 20; Ex. 14 Blackwood Dec. ¶ 22.

Defendants were well aware of its existence.[167]  Thus, Scott & White "knowingly and voluntarily permitted the agent to act in an unauthorized manner."[168]

92.     "The question of agency is usually a fact issue."[169]  "An agency relationship may be implied from the conduct of the parties. . . . Further, both the agency and the extent of the agent's authority may be proved by circumstantial evidence."[170]  At the very least, the facts are sufficient to create a fact issue on agency.  Finally, even if agency is not found, Scott & White ratified the contract by continuing to accept the benefits of employment with full knowledge of the allegedly unauthorized conduct.[171]

### VI.     Dr. Lane Did Not Resign, But Was Forced Out

93.     As Dr. Beswick testified, Dr. Lane did not resign on July 5, 2011, she presented him with a hypothetical inquiring that *if* she resigned, would they keep Dr. Blackwood on:

| | |
|---|---|
| Dr. Beswick: | She told me that if I had a choice, that she is going to resign her position —she told me she would resign her position in order to make sure that Dr. Blackwood would be able to maintain hers. |
| Q: | She said if she had a choice? |
| Dr. Beswick: | Yes. |
| Q: | She presented it as a hypothetical? |
| Dr. Beswick: | Uh-huh. . . . She said if I had a choice -- if I remember correctly, if I have a choice in terms of either Dr. Blackwood or myself, I will resign my position.[172] |

---

[167] Ex. 17 Beswick Dep. 148:4-22; Ex. 15 Lane Dec. 20;  Ex. 14 Blackwood Dec. 22.
[168] *Lozada*, 323 S.W.3d at 292.
[169] *Jarvis*, 390 S.W.3d at 639.
[170] *Id.*
[171] *Schakosky v. Client Services, Inc.*, 634 F. Supp. 2d 732, 735-36 (E.D. Tex. 2007) ("If an agent acts without authority, the principal can ratify the agent's action and is subsequently bound as if the agent had initially acted with the principal's authority. . . . A party need not show ratification by an express act, as ratification can occur when the principal retains the benefits of a transaction after he acquires full knowledge of the agent's unauthorized act. . . . Of critical importance is the principal's knowledge of the transaction and his actions in light of such knowledge.").
[172] Ex. 17 Beswick Dep. 108:17-109:9.

94.     On July 5, 2011, Dr. Lane had not yet made up her mind about her offer at Harvard and did not formally resign.   Rather, out of concern for Dr. Blackwood's position, she merely presented the hypothetical. [173]   Additionally, Dr. Lane never provided a signed resignation, as provided for in the Senior Staff Handbook.[174]

95.     This is sufficient to create a fact issue regarding Plaintiff Lane's termination, such that summary judgment is inappropriate.

### VII.     Scott & White Healthcare and Scott & White Hospital Should Not be Dismissed

96.     Although Scott & White Clinic claims to be the only proper party, there is sufficient evidence to create a fact issue regarding Scott & White Memorial Hospital and Scott & White Healthcare did indeed have a role in Plaintiffs' employment.   The animal care and use program which encompassed many of Plaintiffs' duties is routinely identified with Scott & White Hospital and Plaintiff Lane's letter appointing her as Attending Veterinarian for Scott & White and an IACUC member of Scott & White reference "Scott & White Memorial Hospital."[175] Dr. Beswick specifically testified that Plaintiffs were engaged to provide services for Scott & White Memorial Hospital.[176]

### VIII.     Defendants Are Not Entitled to Summary Judgment on Plaintiff Blackwood *Quantum Meriut* Claim Because They Did Not Unequivocally Deny that She Would Receive Compensation

97.     "To prove notice, an employer asserting a modification must prove that he *unequivocally* notified the employee of definite changes in employment terms."[177] Although Defendants gave notice of the additional duties, they never gave notice of their intent to not accommodate Plaintiff's request for additional compensation.

---

[173]  Ex. 15 Lane Dec. ¶¶ 13, 15.
[174] Ex. 15 Lane Dec. ¶ 15; Ex. 9 Senior Staff Handbook at Plaintiffs 01098.
[175] Ex. 13 Scott & White Attending Veterinarian Lane Appointment Letter.
[176] Ex. 17 Beswick Dep. 306:16-307:5.
[177] *Hathaway*, 711 S.W.2d at 229.

**PRAYER**

98.     For the foregoing reasons, Plaintiffs respectfully requests that the Scott & White Defendants' Motion for Summary Judgment (Dkt. 48) and Defendant Dr. Richard Beswick's Motion for Summary Judgment (Dkt. 46) be denied in all things and that they have such other and further relief to which they may show themselves entitled.


Dated:  June 24, 2013                         Respectfully submitted,

                                              TAYLOR DUNHAM LLP
                                              301 Congress Avenue
                                              Suite 1050
                                              Austin, Texas 78701
                                              Telephone: (512) 473-2257
                                              Facsimile: (512) 478-4409
                                              ima@taylordunham.com
                                              dtaylor@taylordunham.com


                                              By:  /s/ Isabelle M. Antongiorgi
                                                   Donald R. Taylor
                                                   State Bar No. 19688800
                                                   Isabelle M. Antongiorgi
                                                   State Bar No. 24059386
                                              **ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system on June 24, 2013, which will send notification of such filing to the following counsel of record who are deemed to have consented to electronic service:

R. Chad Geisler
Missy Atwood
Ryan Bueche
Germer Gertz Beaman & Brown, L.L.P.
301 Congress Avenue
Suite 1700
Austin, Texas 78701

<u>/s/ Isabelle M. Antongiorgi</u>
Isabelle M. Antongiorgi